### PEOPLE ex rel. McCORMICK v. PARTRIDGE.

(Supreme Court, Appellate Division, First Department. June 10, 1904.)

1. POLICE COMMISSIONER—TRIAL OF OFFICER—FINDING—CONCLUSIVENESS.

A finding by the police commissioner of the city of New York on the trial of a police officer charged with a breach of duty, when against the weight of the evidence, is not conclusive on the courts.

2. SAME—RECEIVING BRIBE—EVIDENCE—SUFFICIENCY.

On certiorari to review the proceedings before the police commissioner of the city of New York, in which a police officer was tried on a charge of receiving a bribe for accepting a bondsman as surety for the appearance of a prisoner in court, evidence examined, and held insufficient to support a finding by the commissioner that a bribe was received by the accused officer.

Certiorari by the people, on the relation of Thomas McCormick, against John N. Partridge, as police commissioner of the city of New York, to review the dismissal of relator as sergeant of the police force of the city. Reversed.

Argued before VAN BRUNT, P. J., and HATCH, PATTERSON, O'BRIEN, and LAUGHLIN, JJ.

Louis J. Grant, for relator.

Theodore Connoly, for respondent.

O'BRIEN, J. The relator, a sergeant of police, was charged and convicted of the offense of having received on the night of September 2, 1902, from the friend of a prisoner in the station house, the sum of $5, for accepting a bondsman as surety for the prisoner's appearance on the following morning in the police court. The testimony against him was to the effect that he permitted the $5 to be placed on his desk, and pushed it to one side, from which the inference was drawn that he willingly assented to taking it as a bribe or gratuity.

We would not, if we could, minimize the gravity of the charge, which if proved, would amply justify the action of the commissioner in dismissing him from the force. It is because of the gravity of the offense charged, and its effect upon the character and position of the relator, that we feel called upon to deal at some length with the weight and credibility of the testimony, to the end that, if it sustains

¶ 1. See Municipal Corporations, vol. 36, Cent. Dig. § 504.

88 N.Y.S.—42

the charge, the force may be freed from an unworthy officer, and, if insufficient, the relator may be saved from disgrace and the loss of a life's work.

It appears that the relator, by long service, covering a period of 30 years, and a good record in the department, had risen from the ranks to the position of sergeant, and had earned the right to a pension. Taking, therefore, the charge, the open manner in which the money was said to have been given, the serious results which the relator must have known would naturally follow if informed against, and which, from the commissioner's conclusion as to his guilt, has followed, we are required to examine with care the testimony, in order to determine whether the finding is or is not against the weight of evidence. Upon a conflicting question of fact we are bound by the conclusion of the commissioner, and it is only in cases where we are satisfied that the one reached is clearly against the weight of evidence that we are at liberty to interfere. People ex rel. Stephenson v. Greene, 92 App. Div. 243, 87 N. Y. Supp. 172.

The record shows that about 3 o'clock in the afternoon of September 2, 1902, William McIntosh was arrested for intoxication, and taken in an unconscious condition to the station house in the precinct of which the relator was sergeant. At about 11 o'clock that night, a friend of the prisoner, Dr. Kepke, appeared before the sergeant's desk to give bail, and the sergeant stated that he did not know him. The doctor said he owned property in Brooklyn, and the relator rejected him, as Brooklyn was without the jurisdiction. He then asked to talk with the prisoner, and the relator gave him permission. Nothing was said by the relator, according to the doctor's own testimony, about making any other arrangement for bail; but he says that while in the rear of the station house he was approached by a patrolman, who told him a surety could be obtained who would be accepted. The doctor's statement is that he asked how much it would cost, and was told $12, to which charge he assented, and the patrolman left, and then returned with Thomas Summers, who offered himself as bondsman; that, without anything more being said, the sergeant filled out the bond and called the prisoner, who came to the desk, in front of which the doctor and Mr. Summers were standing, and went inside to sign the bond, which he did, having considerably recovered from his intoxication; that Summers signed the bond as surety for the prisoner's appearance, and the relator told the prisoner to take his valuables, and produced an envelope, which was opened on the desk, and $2 in bills and a watch and chain were taken out and received by the prisoner. The doctor testified that after the bond was signed he took out a roll of money, and he continues:

"I said to Mr. Summers, 'Here is the $5,' and Mr. Summers said, 'Give it to the sergeant,' and I stood there with the $5 in my hand, and Mr. Summers took the $5 from my hand and laid it on the desk in front of the sergeant, and the sergeant took the $5 and moved it to some other place * * * laid it over to the left of himself.".

The doctor further says that thereupon he and McIntosh and Summers left the station house, and got into a coach and drove to Sum-

mers' saloon, but, when Summers brought out to the coach a glass of whisky for McIntosh, he refused to let him have it, and threw it away.

McIntosh testified that he was called to the desk, and the bond was given to him to sign, which he did, and received his property; that he did not remember the precise conversation, but saw the doctor give Summers a bill, and saw Summers hand it over to the relator, who, he thought, pushed it to one side. He further testified that, instead of appearing at court the next morning, he remained in bed, because he "was in no condition"; and it appears that Summers went to Brooklyn for him, and in the afternoon got him, and that further expense was incurred; it being testified that altogether $31 was expended, which included the $5 to Summers, claimed to have been handed to the relator; $5 for the coach; $1 to the patrolman for calling Summers; $15 to a man at the court; and $5 to the policeman who made the arrest for failing to appear. The relator denied that there was any conversation about money, or that either Summers or the doctor placed any money on his desk, or that he accepted, asked for, or knew of any money being paid by the doctor, and stated that the only money on his desk was that which he gave back to the prisoner together with the watch. The doorman testified that he was standing immediately behind the doctor and Summers at the time; that Summers did not put any money on the relator's desk, and that no such conversation occurred; and that he did not see the doctor give any money to Summers. A patrolman named Wilbur testified that he was at the door, looking towards the group at the desk, and that no money was handed over the desk to the sergeant by the doctor or Summers. Summers' testimony as to what occurred is that while they were standing before the sergeant, and without anything being said about money, the doctor slipped a bill into his pocket and pressed it into his hand, and that subsequently he found, outside the police station, that it was a $5 bill. He denies that he passed over to the sergeant any money whatever. A Mr. Barber, called by the relator, testified that, with respect to the $5 transaction, the doctor had told him that he paid the money, but did not know who got it.

Apart from the almost incredible character of the charge itself, that a bribe was thus given to the sergeant openly upon his desk, in the presence of inferior officers, and even of strangers, by one who it is claimed was a professional bondsman, and when given was accepted by an officer who had a good record of 30 years, our attention, in considering the conflict of testimony presented at the trial, is drawn to the fact that, according to the version of the doctor and McIntosh, the bondsman was left entirely without payment for becoming surety upon the bond of the prisoner, with whom he was not personally acquainted. The natural inference would be that Summers, if a professional bondsman, as claimed, in going upon a $500 bond for an entire stranger, expected some compensation. This the doctor anticipated, and agreed to the price named of $12; and the account of what was paid that night shows that $11 was expended, namely, $5 for the bond, $5 for the coach, and $1 to a patrolman

who called the bondsman. Summers testified that, without anything being said, he was given a bill in an unobtrusive manner, which he retained, and subsequently found to be $5; and this account seems to be the more natural one, and coincides with the testimony of the sergeant, Wilbur, and the doorman that no money was handed up to the desk. It will be observed, also, that there is not a word of testimony that the relator had suggested or was in any way connected with obtaining the bondsman, nor was it testified that any money was given before the bond was signed and the prisoner released, and it was not shown that the relator asked for or acknowledged the receipt of any money, or retained the bill; the testimony being merely that he pushed it to one side. And it is more significant still that the doctor does not say that the conversation between him and Summers about the $5 bill was heard by the relator, or that he had anything to do with the transaction, further than pushing aside the bill when laid on his desk. This latter would be enough, if established; but, on the weight to be attached to the testimony, it is unlikely that, without anything being said or heard by the relator, he should, on a $5 bill being placed on the desk, push it aside, without either comment or explanation by any one as to the purpose or reason for its being placed on the desk. It will be recalled, therefore, that the whole question at issue is, was the $5 which was given by the doctor to Summers placed on the desk of the station house, and by the relator pushed to one side? We think that the weight of evidence is against the statement of the doctor and McIntosh that the money was placed on the desk. With respect to McIntosh, it appears that he had been that afternoon so intoxicated that he did not know where he was, and that, although he came out to the desk when called that night, and signed the bond, it was thought best to take him away in a carriage, and the doctor considered it unwise to give him a stimulant, and that the next day his condition was such that he could not attend court, nor did he get out of bed till the afternoon when Summers went to Brooklyn for him. Upon the trial, McIntosh was plainly irritated, and went so far as to refuse to answer questions asked him by the relator's counsel and the commissioner; and, from his manner of testifying, and his condition upon the night in question, we think little weight can be attached to his recollection of what occurred in the station house.

The doctor, it will be noticed, says that he gave the money to Summers, and not that he gave or offered it to the relator. He had that night presented himself as bondsman, claiming that he had property in Brooklyn; but, as this did not qualify him, in the judgment of the relator, he was rejected. Disappointed, he was obliged —so he testifies—to expend money for a bondsman, and, no doubt, he believed that the $5 which he gave to Summers was intended for the sergeant. That he was uncertain, however, as to just what became of the $5, is apparent from the testimony of Mr. Barber that the doctor had said that he paid the money that night, but did not know who got it. On the other hand, we have the unqualified testimony of the relator, the doorman, Wilbur, and Summers that no money was put upon the desk. We have not overlooked the fact

that the credibility of Summers' testimony is seriously affected by his admission that he made false statements as to what happened that evening when questioned by an assistant district attorney at a meeting called by the captain of the precinct at which the relator and others were present. The explanation given by Summers is that he thought the interview related to his license which the assistant district attorney had threatened to have canceled, and in this connection it appears that upon the trial the attorney made such a threat. Whatever the explanation, however, the version given by Summers upon the trial commends itself as true; the only point in which his testimony is controverted being as to whether there was a conversation at the desk, which concluded with his placing money before the relator. As stated, the other three witnesses also deny any such occurrence. And though it is further contended that there are discrepancies between the testimony of both the relator and Wilbur and what they said at the interview, we do not find any which are unexplained and which are so serious as to discredit them. Considering the positive character and reasonableness of the testimony in behalf of the relator, the statement testified to have been made by the doctor, and uncontradicted, that he did not know who got the money, and the condition of McIntosh, which renders his testimony of the occurrence unreliable, the evidence cannot be said to preponderate in favor of the view that a professional bondsman, called at a late hour of the night to go bail for an entire stranger, would, before the eyes of so many persons, hand over to the sergeant, as a bribe or gratuity, the whole amount of money which (nothing being said to him to the contrary) he had a right to assume was given to him as remuneration for his trouble and the responsibility he had undertaken.

On the ground, therefore, that a careful review of the record leads to the conclusion that the commissioner's finding dismissing the relator was against the weight of evidence, we think that the writ should be sustained, the proceedings annulled, and the relator reinstated, with $50 costs and disbursements. All concur.

<hr>